**Debevoise & Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

November 13, 2020

**By ECF**

Honorable William H. Pauley III
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1920
New York, NY 10007

      **Re:** *United States v. Sidney Bright*, Case No. 06-CR-00242 (WHP)

Dear Judge Pauley:

      We represent Sidney Bright *pro bono* and respectfully submit this motion requesting that he be resentenced pursuant to the First Step Act of 2018, Pub. L. 115-391, § 404, 132 Stat. 5194, 5222 (2018) [hereinafter FSA].  We respectfully request that the Court exercise its discretion to reduce Mr. Bright's sentence to time served.  Given the significance of this motion to Mr. Bright's future, we respectfully request that the Court schedule a hearing at which the Court permits Mr. Bright the opportunity to be heard.[1]

      On September 30, 2019, in response to Mr. Bright's request for counsel, the Court referred his case to the Federal Defenders of New York who in turn referred his case to our firm––Debevoise & Plimpton LLP—and we agreed to represent Mr. Bright *pro bono*.

      Mr. Bright has been in federal custody for over fourteen years, and with good time, he has now served over sixteen and a half years of his thirty-eight year and four month- sentence. He is eligible to be resentenced under the FSA and a reduced sentence is warranted in consideration of his exemplary conduct and work experience while incarcerated and in light of Congress' clear intent to reduce the sentence of prisoners like Mr. Bright.

      In the alternative, we ask that Mr. Bright be granted compassionate release pursuant to 18 U.S.C. § 3582(c), which was amended by § 603 of the FSA to allow an inmate to request compassionate release directly from a court if he has first requested that the Bureau of Prisons (the "BOP") make such a motion on his behalf.  18 U.S.C. § 3582(c)(1)(A) (2018); *see also*

---

[1] Mem. Endorsement 2, *United States v. Rose*, No. 03 CR 1501 (S.D.N.Y. April 16, 2019) (finding that although "defendant's presence at a sentence reduction hearing may not be required by Federal Rule 43 of Criminal Procedure, the Court concludes that [defendant's] presence at the hearing is necessary for the Court to render a fair and appropriate sentence in this case"); T. Proceedings Judge Rakoff, 23:18-25:3 *United States v. Martinez*, No. 04 CR 48 (S.D.N.Y. May 30, 2019) (reflecting defendant's presence and testimony at oral argument against the government's objection).

1

*United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. 2020) (the statute "requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.") (emphasis in original); *United States v. Brooker*, No. 19-3218, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020) ("When the BOP does not timely act or administrative options are exhausted, 'whichever is earlier,' discretion to decide compassionate release motions is to be moved from the BOP Director to the courts."). Mr. Bright suffers from complicated hypertension, sickle trait, and borderline anemia, which puts him at heightened risk of serious illness or death if infected by COVID-19. *See* Ex. A, Clinical Director Letter. Risk mitigation is the only known strategy to protect vulnerable groups from COVID-19. Therefore, correctional public health experts and the Attorney General have recommended the release from custody of people most vulnerable to COVID-19, and that provides an additional reason to grant his motion for resentencing.[2]

## Background

On May 19, 2010, following a jury trial, Mr. Bright was convicted of two offenses:

- conspiracy to distribute and possess with intent to distribute crack cocaine in violation of 21 U.S.C. § 846 (Count One); and

- possession of a firearm in furtherance of a drug conspiracy in violation of 18 U.S.C. § 924(c) (Count Two)  *See* J. 1, ECF No. 135.

The jury found that the drug trafficking conspiracy involved at least fifty grams of crack cocaine and that Mr. Bright was in possession of a firearm in furtherance of the narcotics conspiracy. *See* Jury Verdict Sheet, May 19, 2010.

On December 9, 2011, this Court sentenced Mr. Bright to 400 months imprisonment on Count One and sixty months on Count Two to run consecutively, followed by a lifetime period of supervised release. Sentencing Tr. 31:25 – 32:1–4. For the purposes of calculating Mr. Bright's sentencing range under the advisory United States Sentencing Guidelines ("Guidelines"), the Court found that the drug conspiracy (Count One) involved at least 2.8 kilograms of crack cocaine. *Id.* at 26:16-19. Despite the fact that Mr. Bright was acquitted of the murder of Heriberto Diaz at trial, the Court determined that it was nevertheless authorized to consider the acquitted conduct, finding that the government had proved Mr. Bright's involvement in the murder by a preponderance of the evidence and that the contemplated upward departure based on the acquitted conduct was not enormous. *Id.* at 27:11–28:16. Taking into consideration the acquitted conduct, the Court determined that the base offense level was forty-three and the Guidelines sentence was life. *Id.* 28:12–29:1; *see* U.S. SENT'G GUIDELINES MANUAL § 2D1.1(d) (U.S. SENT'G COMM'N 2011). The Court, however, declined to give a life sentence, explaining that "rehabilitation may be possible for Mr. Bright," and instead imposed a

---

[2] Memorandum from U.S. Attorney General Barr to the Director of the Bureau of Prisons Regarding Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), https://www.nacdl.org/getattachment/c80b217f-eada-4e3a-bdba-5413c3a8e103/ag-barr-homeconfinement-040320.pdf.

non-Guidelines sentence of 400 months on Count One, followed by sixty months' imprisonment on Count Two, to be served consecutively, followed by lifetime supervised release. *Id.* at 31:10–11; 32:1–4.

Mr. Bright's post-sentencing record confirms the Court's assessment—Mr. Bright has done everything in his power to rehabilitate himself, as demonstrated by his clean disciplinary record and exceptional efforts to improve himself and serve his community. In the words of the Reentry Affairs Coordinator at FCI Otisville, where Mr. Bright is incarcerated, Mr. Bright's "behavior demonstrates that he is actively making efforts to make amends for his crime, while improving his overall abilities so he can become a productive member of society." *See* Ex. B, Bridges Letter. These individualized facts matter, and weigh heavily in favor of granting Mr. Bright the relief he seeks.

On January 23, 2020, the United States Probation Office filed a Supplemental PSR, indicating that Mr. Bright is eligible for a sentencing reduction under the First Step Act based on the new mandatory minimum on Count One. Suppl. Presentence Report, Jan. 23, 2020. For reasons explained below, we agree that Mr. Bright is eligible for relief under § 404 of the First Step Act, but urge the Court to depart downward from the Guidelines range in light of Mr. Bright's rehabilitation and positive post-sentencing conduct.

**I.     Mr. Bright Is Eligible for a Reduced Sentence Under the FSA.**

The Fair Sentencing Act was signed into law on August 3, 2010 with the aim of rectifying the hundred to one penalty scheme for crack cocaine offenses that the public and the United States Sentencing Commission (the "Commission") had long determined was far too harsh and had a disparate impact on Black defendants, like Mr. Bright. *See Dorsey v. United States*, 567 U.S. 260, 268-69 (2012); *see also United States v. Sampson*, 360 F. Supp. 3d 168, 169 (W.D.N.Y. 2019) (finding the Fair Sentencing Act of 2010 "reduced the statutory penalties for cocaine based offenses" in order to "alleviate the severe sentencing disparity between crack and powder cocaine") (internal citations omitted).

The Fair Sentencing Act went into effect immediately, but at the time Mr. Bright was sentenced in 2011, the new thresholds were not applied to crimes committed before August 3, 2010, rendering Mr. Bright subject to sentencing under the pre-Fair Sentencing Act regime.[3] As relevant here, the Fair Sentencing Act amended 21 U.S.C. § 841(b)(1)(A)(iii) by increasing from 50 to 280 grams the amount of crack necessary to trigger the minimum prison sentence of ten years and a maximum of life imprisonment. However, when Mr. Bright was sentenced in 2011, subsection (b)(1)(A) mandated an even higher penalty—twenty years to life—where the defendant had a prior drug felony conviction.

Specifically, at the time of Mr. Bright's sentencing, the enhancement was triggered by a "felony drug offense," defined as any offense "punishable by imprisonment for more than one

---

[3]   The Supreme Court subsequently held that the new penalty structure applied to any defendant sentenced after August 3, 2010, even if the offense was committed prior to that date. *Dorsey,* 567 U.S. at 281–82.

3

year." 21 U.S.C. § 802(44) (2018). But if Mr. Bright had been sentenced in accordance with the Fair Sentencing Act, his prior drug-related conviction would not have triggered this enhanced penalty. When he was nineteen, Mr. Bright was sentenced to just "45 days imprisonment" and five years probation. PSR ¶ 48. To increase the mandatory minimum sentence after the Fair Sentencing Act, the defendant must have committed a "serious drug felony," which includes a conviction for which the defendant served a term of imprisonment of "more than 12 months." *See* FSA § 401(a)(1)(1). Accordingly, under current law, Mr. Bright's mandatory minimum sentence on Count One would be only five years with a maximum sentence of forty years. Including the five-year mandatory minimum on Count Two, if sentenced today, Mr. Bright would be subject to a mandatory minimum of ten years.

The FSA, enacted on December 21, 2018, provided additional relief by expanding the effect of the Fair Sentencing Act. The FSA allows the court to reduce prison sentences imposed under the pre-Fair Sentencing Act penalty scheme, previously ineligible for sentence reduction under the Fair Sentencing Act, and to take into account the rehabilitation of the defendant when determining the new sentence.

Section 404 of the FSA provides that for individuals like Mr. Bright, who were convicted under a "covered offense"—"a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010"—the Court may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Pub. L. 111-220; 124 Stat. 2372) were in effect at the time the covered offense was committed." FSA §§ 404(a)-(b). Congress has made clear that an inmate's prison sentence can be reduced without limitation other than the statutory mandatory minimum. *See* FSA §§ 404(c).

### A. Based on the Drug Quantity Found by the Jury, Mr. Bright Is Eligible for a Sentence Reduction Under the FSA.

Mr. Bright is eligible for relief under § 404 of the FSA, because (1) he was convicted under a "covered offense," the penalties for which were modified by the Fair Sentencing Act; (2) this Court did not previously impose a sentence in accordance with the Fair Sentencing Act; and (3) this is Mr. Bright's first motion for relief under the FSA. *See* FSA § 404(c). The Second Circuit recently clarified that whether a defendant was sentenced under a "covered offense" within the meaning of the First Step Act turns on "the statute under which a defendant was convicted, not the defendant's actual conduct[.]" *United States v. Johnson*, 961 F.3d 181, 187 (2d Cir. 2020) (collecting cases from other courts of appeals). Therefore, Mr. Bright is entitled to relief under the First Step Act, because the penalties associated with his statute of conviction were modified by section two of the Fair Sentencing Act. *Id*; *see also United States v. Maupin*, No. 19-6817, at *7 (4th Cir. Sept. 9, 2019) (finding the language of the statute "creates a clear relationship between 846 and 21 U.S.C. § 841(b)(1)").

### 1. Mr. Bright Should Be Resentenced Based on the Drug Quantity Found by the Jury.

The jury convicted Mr. Bright for participating in a drug trafficking conspiracy involving at least fifty grams of crack cocaine. *See* Jury Verdict Sheet 2, May 19, 2010. For the purposes of determining Mr. Bright's sentencing range, the Court found that the drug conspiracy involved

4

2.8 kilograms of crack cocaine.  *See* Sentencing Tr. 26:16-19.  At the time of Mr. Bright's sentencing, the Court's departure from the jury findings on drug quantity did not impact the applicable mandatory minimum—an offense involving fifty grams or more of crack cocaine carried a mandatory minimum of ten years.  *See* § 841(b)(1)(A) (2010).  This has since changed.  Under the Fair Sentencing Act, the drug quantity of fifty grams of crack cocaine would only trigger a mandatory minimum of five years.  *See* §§ 841(b)(1)(A)(iii); 841(b)(1)(B)(iii).

We respectfully request that Mr. Bright be resentenced based on the drug quantity found by the jury, in accordance with the rule articulated by the Supreme Court in *Alleyne v. United States*, 570 U.S. 99, 103 (2013) (holding that any fact that increases a mandatory minimum sentence for a crime is an "element" of the crime, not a "sentencing factor," and must be submitted to the jury).  Courts in the Second Circuit have repeatedly relied on this logic.  *See United States v. Gonzalez*, 420 F.3d 111, 133-34 (2d. Cir. 2005) (finding that "drug quantities specified in 21 U.S.C. § 841 are elements that must be pleaded and proved to a jury or admitted by a defendant to support any conviction on an aggravated drug offense"); *see also United States v. Rose*, 379 F. Supp. 3d 223, 231 (S.D.N.Y. 2019) (rejecting the government's position that defendants were responsible for 1.5 kilograms of crack cocaine based on the judge's findings as opposed to the jury's findings of fifty grams or more of crack cocaine since "any fact that served as the basis for a mandatory minimum sentence had to have been found by a jury beyond a reasonable doubt, rather than found by a judge by a preponderance of the evidence"); *United States v. Martinez*, No. 04 CR 4820, 2019 WL 2433660, at *2 (S.D.N.Y. June 11, 2019) (finding that "the phrase 'violation of a Federal criminal statute' refers to the amount charged in the indictment upon which [Defendant] was convicted, not the amount attributed to him by the judicial finding").

We ask the Court to resentence Mr. Bright according to the statutory minimum associated with the jury's finding on drug quantity and reduce Mr. Bright's sentence for Count One from 240 to 60 months under 21 U.S.C. § 841(b)(1)(B).  Applying the sentencing enhancement under 21 U.S.C. § 851 for Mr. Bright's prior felony drug conviction, the mandatory minimum on Count One is doubled from 60 to 120 months.  *See* § 841(b)(1)(B).  With the additional five years for violating § 924(c), under the FSA the mandatory minimum on Counts One and Two is fifteen years, as opposed to twenty-five.  With good time, Mr. Bright has already served more than this applicable statutory minimum.

**II.     The Court Should Exercise Its Discretion to Mr. Bright's Sentence to Time Served**.

   **A.     The Court Should Consider Changes to the Guidelines and Statutory Penalties to Determine Whether Sentence Reduction Is Warranted**.

When imposing the sentence of 400 months, the Court determined that the Guidelines range for Count One was 360 months to life, based on the drug quantity found by the Court at sentencing and Mr. Bright's leadership role in the conspiracy.  *See* Sentencing Tr. 28: 5-11.  As explained above, however, this Court found that an upward adjustment based on Mr. Bright's acquitted conduct was not an "enormous upward adjustment" and therefore, under Second Circuit law, it could be considered.  *See* Sentencing Tr. 28:13-16; *Id*. at 27:21–25 (citing *United States v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2002)).

However, the baseline has since shifted. In 2014, the Commission amended the Guidelines and reduced the base offense level associated with the drug trafficking conviction by two levels. *See* Amendment 782 (U.S. SENT'G COMM'N 2014). The Commission later voted to make this amendment retroactive.[4] As a result, the applicable Guidelines range is 292–365 months, rather than 360 to life. This calculation is based on the Court's finding that Mr. Bright was responsible for 2.8 kilograms of crack cocaine, which would now establish a base offense level of thirty four, with a four-point enhancement for the leadership role, and a Criminal History Category III. *See* Sentencing Tr. 26:16-19; 28:9-11; U.S. SENT'G GUIDELINES MANUAL § 2D1.1(c)(3) (U.S. SENT'G COMM'N 2018). Furthermore, as argued, *supra,* we believe that Mr. Bright should be resentenced based on the drug quantity found by the jury, in which case, the upward departure is even more "enormous."

At sentencing, this Court saw fit to depart downward from Mr. Bright's Guidelines range, recognizing the possibility of his rehabilitation. Sentencing Tr. at 31:10-11. That downward departure was anchored by a statutory minimum and Guidelines-based calculation which has since shifted lower. While the Court is not required to consider changes to Mr. Bright's Guidelines range that do not "flow from Sections 2 and 3 of the Fair Sentencing Act," *see United States v. Moore*, 975 F.3d 84, 93 (2d Cir. 2020), we ask that the Court weigh the change to the Guidelines range in addition to the new statutory benchmarks and Mr. Bright's tireless efforts toward rehabilitation as factors relevant to whether sentence reduction is warranted. *See United States v. Ortiz*, No. 19-3073, 2020 WL 6280878, at *2 (2d Cir. Oct. 27, 2020).

Mr. Bright's original sentence is more punishment than necessary to achieve the goals of imprisonment. *See United States v. Powell*, No. 3:99-cr-264-18 (VAB), 2019 WL 4889112, at *10 (D. Conn. Oct. 3, 2019) (granting time served under the FSA for murder cross reference offender convicted for involvement in crack cocaine conspiracy); *see also United States v. Warren*, No. 3:95-cr-00147-01, 2020 WL 3036011, at *2–3 (S.D.W. Va. June 5, 2020) (same); *United States v. Anderson*, Cr. No. 0:04-353 (CMC), 2019 WL 4440088, at *1, 4 (D.S.C. Sept. 17, 2019) (granting a reduced sentence under FSA for murder cross reference offender). In light of the FSA and its underlying goal of reducing over-incarceration, and Mr. Bright's conduct since sentencing, we ask the Court to consider a sentence of time served instead.

### B. The Relevant § 3553(a) Factors Strongly Favor Sentence Reduction.

Section 404(b) of the FSA grants discretion to the Court to resentence a prisoner, consistent with the policy objectives of the FSA, if a reduction in sentence is warranted after consideration of the factors detailed in 18 U.S.C. § 3553(a) and the individual's post-sentencing conduct, even if the penalties applicable to the eligible individual's specific conduct would remain the same under the Fair Sentencing Act. *See United States v. Barnes*, No. 1:04-cr-00186-LAP, at (S.D.N.Y. July 7, 2020) (granting defendant convicted of trafficking crack cocaine, and conspiracy to kidnap and murder a sentence reduction to time served under the First Step Act)

---

[4]   Amendment 782 became effective on November 1, 2014. *See* U.S. Sentencing Commission, *Amendment to the Sentencing Guidelines* (July 18, 2014), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20140718_RF_Amendment782_0.pdf.

(citing *United States v. Williams*, No. 03 CR 795, 2019 WL 3842597, at *4 (E.D.N.Y. Aug. 15, 2019) (determining that the defendant was eligible for resentencing and "finding it appropriate to consider all applicable factors under 18 U.S.C. § 3553(a), as well as the defendant's post-sentencing conduct while in prison")); *see also Rose,* 379 F. Supp. 3d at 233 (stating that the district court must "be able to consider the most recent evidence of a defendant's life and characteristics").

For Mr. Bright, the 18 U.S.C. § 3553(a) factors weigh in favor of sentence reduction. Factors under § 3553(a) require the Court to impose a punishment that reflects the seriousness of the offense; promotes respect for the law and provides just punishment; affords adequate deterrence to criminal conduct; protects the public from further crimes of the defendant; and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In weighing those factors, the Court's most fundamental responsibility is to impose a sentence that is "sufficient, but not greater than necessary." *See* § 3553(a). Mr. Bright's current sentence of thirty-eight years and four months is more than what is necessary to achieve these statutory goals.

Imposing a reduced sentence on Mr. Bright would be consistent with the Congressional intent and understanding behind the FSA. The FSA reflects Congress' intent to reform historic drug sentencing laws that perpetuated a system of mass incarceration, harming society and disproportionately impacting Black communities. The FSA indicates a shift in Congress' understanding of the "seriousness" of drug offenses and the "just punishment" for offenses of which Mr. Bright was convicted. This shift in understanding of how best to "promote respect for the law" and to "protect the public" is reflected in the FSA.

A reduced sentence for Mr. Bright would also afford adequate specific and general deterrence. A sentence affords adequate deterrence to criminal conduct if it achieves (1) general deterrence, which is aimed at "generally [deterring people] from engaging in crime" and (2) specific deterrence, which is aimed at "prevent[ing] recidivism." *United States v. Bannister*, 786 F. Supp. 2d 617, 660, 688 (E.D.N.Y. 2011) (finding sentences imposed on eleven youthful defendants involved in drug trafficking scheme because of statutory minima were "disproportionate to the crimes committed and the backgrounds of the defendants."). Mr. Bright has served over fifteen years in prison. He has borne significant punishment for what he acknowledges were serious offenses. At fifty-two, he is at a reduced rate of recidivism and is less likely to commit a crime than younger individuals.[5] At the same time, we ask the Court to

---

5   *See* RACHEL ELISE BARKOW, PRISONERS OF POLITICS 44–45 (2019) ("For most crimes, the likelihood that someone will continue committing them once they hit 40 is negligible. Most juveniles discontinue their criminal activity after brief experimentation with it.").

   According to another study, "older adults (45 and older) were less likely to recidivate than their younger peers . . . At the end of the five-year observation period, only 34% (n=2,190) of those 45 and older were readmitted to prison, while 50.6% (n=15,854) of the younger adult population released . . . had returned to prison during the same time." Sarah Rakes, et. al, *Recidivism Among Older Adults*, JUST. POL'Y J., Spring 2018, at 9, http://www.cjcj.org/uploads/cjcj/documents/recidivism_among_older_adults_correlates_of_ prison_reentry.pdf. In general, arrest rates drop to just more than 2% for people between

7

recognize Mr. Bright's immense efforts toward rehabilitation. He has taken advantage of the programs offered in prison and prepared himself to contribute positively to society, while maintaining a clear disciplinary record for over a decade, with only a small infraction for being "untidy" in 2007. *See* Ex. C, Inmate Progress Report.

### C. Mr. Bright's Post-Sentencing Conduct Reflects His Long-Term Commitment to Rehabilitation.

When resentencing Mr. Bright, this Court can consider any relevant factors, including post-sentencing rehabilitation. *See Pepper v. United States*, 562 U.S. 476, 491 (2011) ("Evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing."); *see also, e.g.*, *United States v. Powell*, 360 F. Supp. 3d 134, 140 (N.D.N.Y. 2019) (considering defendant's rehabilitation and disciplinary history); *United States v. Simons*, 375 F. Supp. 3d 379, 388 (E.D.N.Y. 2019) (considering defendant's educational record, family and community ties).

#### 1. Mr. Bright Has Continually Dedicated Himself to Mentorship and Self-Improvement While Incarcerated.

Mr. Bright has been a model prisoner as evidenced by the fact that prison officials in the best position to assess Mr. Bright's transformation while incarcerated all attest to his progress. While incarcerated, Mr. Bright has been steadily employed in a variety of departments including the Visiting Room, Food Service, and UNICOR. *See* Ex. C, Inmate Progress Report. He has also received over seventy-five certificates of achievement for his completion of continuing educational programs in self-improvement, vocational skills, and victim impact programming. *See* Ex. D, Certificates of Achievement. Most notably, Mr. Bright has dedicated his time to mentorship programs designed to help inmates make positive decisions both while incarcerated and after release, serving as "a positive mentor to other inmates." *See* Ex. E, Case Manager Best Letter. In 2013, Mr. Bright completed a five-week Victim Impact Workshop and a sixteen-week Victim Impact Program designed to help offenders recognize and internalize the consequences of their conduct and develop empathic connections with their victims. After completing this training, Mr. Bright has become actively involved with the program and served as a facilitator for the five-week workshop, helping others acknowledge the harm that their actions caused their victims and navigate a path away from crime. In this role, Mr. Bright has drawn from his experience to inspire others to work toward their own rehabilitation. As one participant explained, "[s]eeing guys like Mr. Bright facilitate and pour his heart out really struck a nerve because I can relate to his background and I can imagine who he once was and to see him now the man he is today shows me this program can rehabilitate even people like us who were once criminal minded." Ex. F, Mendez Letter; *see also* Ex. G, Davilla Letter ("Two of the facilitators that resonate[d] to me the most are Bright and Hussein. Their personal experiences and their point of views allow me to relate to them and to wonder to myself how I could have been out

---

age 50 and 65. Rebecca Silber, et. al, *Aging Out: Using Compassionate Release to Address the Growth of Aging and Infirm Prison Populations*, VERA INSTITUTE, Dec. 2017, at 3, https://www.vera.org/downloads/publications/Using-Compassionate-Release-to-Address-the-Growth-of-Aging-and-Infirm-Prison-Populations%E2%80%94Full-Report.pdf.

8

there committing the crimes and not truly comprehending the negative effect I had on people."); Ex. H, Terrell Letter, ("Bright thank you most of all cause a lot of what you shared I can relate to."); *see also* Ex. I, Collected Letters.

Beyond his victim impact work, Mr. Bright has served as a Suicide Watch Companion for the Psychology Department at FCI Otisville for the past three years. This role requires empathy and ease communicating with both staff and inmates. Mr. Bright has consistently showed himself to be worthy of the trust extended by his supervisors, proving to be "a reliable member of the team" who "consistently conduct[s] himself in a thoughtful and respectful manner." *See* Ex. J, Staff Psychologist Letter. Even in this complex and challenging position, Mr. Bright's commitment is unwavering, and his "contributions have made a significant positive impact on the FCI Otisville population and the services provided by the Psychology Department." *Id.* Mr. Bright's participation in the Victim Impact Program and his service as a Suicide Watch Companion is completely voluntary. His commitment to these programs reflects his serious intent to turn over a new leaf—to transform himself and give back to the community—while incarcerated. *See* Ex. C, Inmate Progress Report.

Reviewing Mr. Bright's history in prison, a clear pattern develops—he does not shy away from a challenge, and after mastering the material, he takes the opportunity to share what he has learned with his community. For example, after completing the Positive Mental Attitude Effective Alternatives Program, he became a Peer Assistant, teaching inmates how to change patterns of negative thinking to clear space for more productive and positive mental habits. He also serves as a facilitator for Doing Time with the Right Mind and Getting Out by Going In— programs designed to help inmates adjust to incarceration, learn strategies for managing stress and anger, and develop conflict resolution skills. *See* Ex. C, Inmate Progress Report.

In addition to this rehabilitative programming, Mr. Bright obtained his GED in 2012 and has completed a variety of classes gaining vocational (carpentry, HVAC, electrical, and floor care) and career (writing workshop, advanced computer skills, certificate in career readiness from Baylor University) skills. *See* Ex. K, Education Transcript. He has shown a commitment to his health, taking exercise classes and learning about managing chronic health issues. In 2013, he completed a Drug Education program, which examined both the impact of substance abuse on one's physical and mental health and its effects on family members and society more broadly. *See* Ex. C, Inmate Progress Report. Finally, Mr. Bright received a Certificate of Achievement for completing the Twelve-Step Program and attending ten sessions of Alcoholics Anonymous. *See* Ex. D, Certificates of Achievement.

### D.     Mr. Bright's Release Plan Provides for a Stable Home Environment.

If released, Mr. Bright plans to live with his mother, Francis Bright, who resides in the Bronx, New York. She offers a strong support system and is prepared to help her son navigate his re-entry into society. Mr. Bright also has the benefit of support from a wide network of family and friends who have witnessed his growth while incarcerated. Their letters attest to his rehabilitation. *See* Ex. L, Collected Letters of Support. In 2016, Mr. Bright completed the rigorous Defy Venture reentry preparation program, CEO of Your NEW Life, allowing him to apply for their post-release academy, which provides employment assistance and job placement.

*See* Ex. M, Defy Letter.  Many of the steps and programs Mr. Bright has participated in while incarcerated ensure that he will successfully contribute to society upon release.

### III.     The Court Should Grant Compassionate Release to Mr. Bright Because of the Heightened Risk of Harm Due to the COVID-19 Pandemic.

Prior to enactment of the First Step Act, only the Bureau of Prisons could move a court to reduce a prisoner's sentence due to extraordinary and compelling reasons.  However, the First Step Act amended the compassionate release statute to allow a prisoner to request relief directly from the court, either after he has fully exhausted all administrative remedies to request that the BOP bring a motion, "or [upon] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A) (2018); *see also United States v. Haney*, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020) (the statute "requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.") (emphasis in original); *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("When the BOP does not timely act or administrative options are exhausted, 'whichever is earlier,' discretion to decide compassionate release motions is to be moved from the BOP Director to the courts.").

Mr. Bright requested that the warden of FCI Otisville make a motion on his behalf, and his request was denied on October 20, 2020.  *See* Ex. N, Letter from Acting Warden LeMaster.  As more than thirty days have lapsed since the warden's receipt of the request, Mr. Bright now moves the Court directly for relief.  *See* § 3582(c)(1)(A).

According to the Center for Disease Control and Prevention, COVID-19 is most likely to cause serious illness and death in individuals with certain underlying medical conditions, including hypertension, sickle cell trait, and anemia.  Given his health complications, Mr. Bright falls into this category of heightened vulnerability.[6]  *See* Ex. A, Clinical Director Letter.  Recent news reports from federal prisons indicate that these institutions are unable to provide medical care "in the most effective manner" to their most vulnerable inmates.  *See* 18 U.S.C. § 3553(a)(2)(D).  In general, COVID-19 presents a threat to incarcerated populations across the United States as the close proximity of inmates makes "social distancing . . . impossible."[7]  Limited resources and other restrictions render the "[p]ractices urged elsewhere to slow the spread of the virus—avoiding crowds, frequent handwashing, disinfecting clothing—[] nearly

---

[6]     *See* CDC, PEOPLE WITH CERTAIN MEDICAL CONDITIONS, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#diabetes;%20https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Oct. 6, 2020); Timotius Ivan Hariyanto, et al., *Anemia is associated with severe coronavirus disease 2019 (COVID-19) infection*, TRANSFUS APHER SCI. (Aug. 28, 2020).

[7]     Timothy Williams, et al., *"Jails are Petri Dishes": Inmates Freed as the Virus Spreads Behind Bars*, N.Y. TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last updated May 20, 2020).

10

impossible to carry out[.]"[8]  *See Haney*, 454 F. Supp. 3d at 323.  FCI Otisville is unfortunately no exception.[9]

Granting Mr. Bright the requested reduction in sentence would not only protect him, an individual with heightened vulnerability to COVID-19, from transmission of the virus, but it would also allow for greater risk mitigation for all people held or working in FCI Otisville.

## **CONCLUSION**

Working with unrelenting dedication to acknowledge and grow from his past mistakes, Mr. Bright has cultivated the necessary skills and emotional resources to become a productive member of society.  *See* Ex. O, Bright Letter.  The First Step Act grants district courts broad discretion to reduce sentences imposed under the excessively harsh penalty structure for crack cocaine-related offenses that Congress has now rejected.

As Mr. Bright's exemplary record illustrates, he has worked consistently to rehabilitate himself and his fellow inmates while incarcerated.  In recognition of these efforts, the mitigating factors surrounding his conviction, and the shift in the applicable statutory framework, we ask the Court to reduce Mr. Bright's sentence to 188 months.

Dated: November 13, 2020

                                      RESPECTFULLY SUBMITTED

                                      /s/ Elisabeth Shane
                                      Elisabeth Shane
                                      Jillian Tancil

                                      DEBEVOISE & PLIMPTON LLP
                                      919 Third Avenue
                                      New York, New York 10022
                                      (212) 909-6000
                                      eashane@debevoise.com
                                      jtancil@debevoise.com

                                      *Attorneys for Defendant Sidney Bright*

CC: AUSA Kiersten Ann Fletcher (via ECF)

---

[8]    *Id*.

[9]    High-profile inmates, such as the President's former attorney Michael Cohen, have been released from Otisville.  Conditions, including limited supplies and unsafe living conditions, remain difficult for those who remain.  *See* Walter Pavlo, *Otisville Federal Prison Camp Is More Like A Higher Security Prison In Fight Against Covid-19*, FORBES (June 28, 2020), https://www.forbes.com/sites/walterpavlo/2020/06/28/otisville-federal-prison-camp-is-more-like-a-higher-security-prison-in-fight-against-covid-19/#4d964a8bbe48.