UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

           -against-

SIDNEY BRIGHT,

                    Defendant.

06 CR 242 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are Defendant Sidney Bright's motions for
a reduction in sentence pursuant to Section 404 of the First
Step Act of 2018 and for compassionate release pursuant to 18
U.S.C. Section 3582(c)(1)(A).  (Dkt. no. 163).  For the reasons
set out below, the motions are denied.

**I.  Background**

**a. Offense Conduct and Trial**

Defendant was a violent and successful drug dealer for
almost ten years in the Bronx, where he operated a large drug
business that sold crack, powder cocaine, and heroin in the
vicinity of Courtlandt Avenue. Defendant had enforcers who
worked for him and who, at Defendant's direction, shot guns at
buildings where Defendant's competitors sold drugs, and at rival
drug dealers. In 2002, Defendant paid a neighborhood crack
addict, Tyrone Glynn, to shoot and kill one such rival,
Heriberto Diaz.

1

On July 9, 2008, Defendant was charged in a superseding indictment in four counts: (1) from 1995 to 2004, Defendant conspired to distribute and possess with intent to distribute 50 grams and more of crack cocaine, five kilograms and more of cocaine, and heroin, in violation of Title 21, United States Code, Section 846, (2) between 1995 and 2004, Defendant possessed and used a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, (3) Defendant caused the 2002 death of Diaz during the commission of Count Two in violation of Title 18, United States Code, Sections 924(j) and 2, and (4) Defendant intentionally killed Diaz while engaged in a narcotics conspiracy, in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

Defendant proceeded to trial in May 2010. At trial, the Government's proof demonstrated that from 1995 to 2004, Defendant controlled a narcotics distribution enterprise, initially centered around his home on Courtland Avenue, and eventually expanding to include his supervision of other drug dealers, including Steven Young. Defendant was the boss, see Trial Transcript ("Tr.") at 84, and he had pitchers, lookouts, and managers working for him. Id. The pitchers, including cooperating witness Young, sold drugs to customers and sold

2

crack cocaine 24 hours a day, 7 days a week. Tr. 84, 88. Over time, Defendant began supplying other drug dealers, including Young and Lee Davis, and sold crack, powder cocaine and heroin in Virginia on numerous occasions. Tr. 137-144.

Defendant routinely used guns to further and protect his drug business. From 1995 to 2002, if a competitor was selling drugs in a spot Defendant wanted to control, he asked enforcers to shoot at that location in order to drive the competitor away. Tr. 62-63, 90-91. He provided guns to the enforcers and they shot at the buildings Defendant identified. As Defendant had hoped, competitors stopped selling drugs in front of those buildings. Tr. 135. Steven Young shot at four different buildings or stores at Defendant's request, Tr. 91-93, and Defendant had other enforcers, including Duane Beaty, Clifton Prince, and D[e]val Prisco, shoot at buildings as well. Tr. 133.

In addition to shooting up particular locations, Defendant asked his enforcers to shoot certain rival drug dealers. In 1995 or 1996, Defendant did not want a competitor known as "Satan" selling drugs in his (Defendant's) neighborhood, so he asked Young to shoot at him. Tr. 62. Defendant then accompanied Young and another enforcer, Clifton Prince, as Melvin Brown drove them down the block to find Satan. Tr. 147. Both Young and Brown described the incident at trial. Defendant, Young, Prince, Brown, and another man were in Brown's car and Defendant said to

3

"go get" Satan. Tr. 666. Young, Prince, and Defendant then got out of the car and, while Defendant and Brown stayed by the car, Young and Prince went to Courtlandt Avenue where, as Young testified, they shot at Satan. Brown heard the gunshots, and when Young and Prince returned, the whole car smelled like gunpowder. Defendant then decided that they would drive to his child's mother's house to drop off the gun used in the shooting and then go to a nearby theater so that they had an alibi. Tr. 147-48, 669.

The most significant example of Defendant's use of guns and violence to further his drug business was the murder of Heriberto Diaz. Diaz, a/k/a "Chino," was a drug dealer in Defendant's neighborhood, and he was a competitor to Defendant. Tr. 163-65. In approximately 2001, Defendant told Young that Diaz was selling drugs in Defendant's neighborhood and asked Young to kill him. Tr. 164-65. Defendant offered Young approximately $3500, which Young believed was too little, and after Young declined, Defendant drove away. Tr. 165. Young went to find Defendant, and as Young was walking toward the Jackson Projects, he saw someone shooting into Defendant's car. Defendant's car made a u-turn and drove the wrong way up Courtlandt Avenue, tr. 165-66, and Young later found out from Defendant that Diaz had shot Defendant twice, and Defendant had been hospitalized for a month. Tr. 166-67, 1242-43.

Diaz was charged with the shooting, and Defendant testified against him. In his testimony, Defendant claimed that he had asked Diaz not to sell drugs by his barbershop and that Diaz got mad. Tr. 1239. Defendant then described how Diaz had shot him on October 18, 1999. Tr. 1239. Diaz was acquitted following trial.

Following Diaz's acquittal, in 2002, Defendant again asked Young to shoot Diaz, before ultimately offering to pay Tyrone Glynn $3,500 to do it. The evidence at trial, which included testimony from Young, Glynn and Melvin Brown, established that Defendant asked Young for a gun, retrieved the gun from the apartment of Brown where Young had been staying, and gave it to Glynn. Glynn and Young both testified that Glynn had the gun and shot Diaz, killing him. Tr. 168-181, 923-935.

On May 19, 2010, the jury returned its verdict, finding Defendant guilty on Count One, and finding that the narcotics conspiracy involved more than 50 grams of crack cocaine, and guilty on Count Two, the firearm count. The jury acquitted the Defendant on Counts Three and Four related to the murder of Diaz.

### b. Sentencing

On December 9, 2011, this Court conducted a sentencing hearing. Defendant spoke at length at his sentencing, denying his role in the Diaz murder and accusing Young and other cooperating witnesses of setting him up. See December 9, 2011

Sentencing Transcript ("Sent. Tr.") at 12-22. Defendant did not take responsibility even for his narcotics distribution, the evidence of which was overwhelming, and expressed no remorse for his criminal conduct.

At sentencing, the Government argued the Fair Sentencing Act applied to this case and that the mandatory minimum on Count One was 10 years instead of 20 years. This Court disagreed, finding that Count One carried a mandatory minimum of 20 years' imprisonment because the Fair Sentencing Act did not apply retroactively to Defendant. Sent. Tr. 25-26 ("The new thresholds are not retroactive and accordingly because the government filed a prior felony information Mr. Defendant is subject to a mandatory minimum term of 20 years.")

The Court then proceeded to calculate the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") based on Counts One and Two, finding Defendant's organization distributed more than 2.8 kilograms of crack cocaine, placing Defendant at an offense level 36. Sent Tr. 26. The Court added four levels pursuant to U.S.S.G. § 3B1.1 based on its finding that "Mr. Defendant was unquestionably the leader of a violent and sophisticated drug organization that involved five or more participants." Id. The Court explained that Defendant's organization "sold drugs around the clock seven days a week" and that "Defendant led a group of managers who

6

resupplied and oversaw different portions of the drug organization and pitchers who sold drugs on the streets and lookouts who shielded the workers from police" as well as "enforcers to use violence to scare off rivals." Id. at 26-27. At a total offense level of 40, and Defendant's undisputed criminal history category III, the applicable Guidelines range on Counts One and Two was 360 months to life. Id.

The Court held that, although the jury had acquitted Defendant of Counts Three and Four related to the Diaz murder, the Government had proven the murder by a preponderance of the evidence and therefore the Court could consider the acquitted conduct in determining the applicable Guidelines range. Specifically, because the Government presented "overwhelming evidence" that Defendant ordered the Diaz murder, the applicable Guidelines range increased to a term of life imprisonment. Sent Tr. 28. The Court explained that, in "determining whether a downward departure from a guideline range calculated using acquitted conduct should occur," the Court was required to assess, pursuant to United States v. Cordoba-Murgas, 233 F.3d 704, 709 (2d Cir. 2002), "whether the range is an enormous upward departure for uncharged conduct not proved at trial found only by a preponderance of the evidence and where the Court has substantial doubts about the accuracy of the findings." Sent. Tr. 27. Because, in the Court's view, the murder was "proven by

7

clear and convincing evidence," there was no "substantial doubt" in the Court's mind as to Defendant's role in the Diaz murder, supporting the increase in the Guidelines range to life.

With respect to the applicable mandatory minimum, the Court explained that while it had ruled that the Fair Sentencing Act did not apply retroactively or modify the mandatory minimum sentence, "even if it did it would not matter in this case because Mr. Bright [would] not be getting a mandatory minimum sentence." Sent. Tr. 29. Based on the Court's finding that "Mr. Bright was the architect and leader of the [narcotics] organization" and that the "testimony at trial demonstrated that Mr. Bright was cold and calculating in growing his drug business, disciplining his employees, protecting his turf and eliminating his competition," the Court sentenced Defendant well above the then-applicable 20 year mandatory minimum sentence to a term of 400 months' imprisonment on Count One, to be followed by 60 months' imprisonment on Count Two. Sent. Tr. 30.

### c. The Instant Motions

Defendant requested compassionate release from the Warden of FCI Otisville, and that request was denied on October 20, 2020. (Ex. N to dkt no. 163, Letter from Acting Warden LeMaster). More than thirty days have elapsed since that denial.

On November 13, 2020, Defendant, through counsel, moved for resentencing pursuant to the First Step Act and, in the alternative, for compassionate release. (Dkt. no. 163).

In his motion for compassionate release, Defendant notes that he suffers from various underlying conditions, including obesity, hypertension, sickle cell trait, and anemia. (Dkt. no. 163 at 10). In supplemental papers, Defendant informs that a prior bacterial infection he suffered had resulted in kidney damage, that the infection was "Acute Kidney Injury (AKI) 2nd to sepsis," (dkt. no. 167 at 1), and that the infection recurred in March of 2021, (dkt. no. 168 at 1).

In discussing the Section 3553(a) factors, Defendant argues that his current sentence of thirty-eight years and four months is greater than what is necessary to achieve the statutory goals. (Dkt. no. 163 at 70).

With respect to Defendant's First Step Act motion, the Probation Department concluded in the Supplemental PSR dated January 23, 2020, and the Government agrees, that Defendant is eligible for resentencing on Count One because that count qualifies as a "covered offense" within the meaning of the FSA in light of United States v. Johnson's 962 F.3d 181 (2d Cir. 2020). Because the jury found Defendant responsible for 50 grams of crack, he is now subject to the statutory minimums set out in 21 U.S.C. Section 841(b)(1)(B)(iii). Because the

9

Government filed a prior felony information, the applicable mandatory minimum pursuant to 21 U.S.C. Section 851 is ten years.  See Supplemental PSR.[1]  Specifically, he argues that 1) reducing his sentence would be consistent with Congressional intent reflecting  a "shift in Congress' understanding of the 'seriousness' of drug offenses and the 'just punishment' for offenses of which Mr. Defendant was convicted;" 2) specific and general deterrence have been achieved through his having served fifteen years and now being 52; 3) Defendant has rehabilitated himself through, inter alia, earning his GED, being steadily employed in a variety of departments, including UNICOR, participating in and becoming a facilitator in a Victim Impact Workshop, earning some seventy-five certificates in continuing educational programs, and participating in various vocational courses.  (Dkt. no. 163 at 7-9).  Defendant also argues that he has a release plan providing that he live with his mother in the Bronx and will apply for employment assistance and job placement.  (Id. at 9-10).

---

[1] Defendant argues that the applicable mandatory minimum is five years, because he does not have a prior felony pursuant to Section 401 of the First Step Act. Because those changes apply only to defendants who have not been sentenced, Defendant does not benefit from this change.

## II.  Applicable Law

### a. The First Step Act

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." United States v. Dillon, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)). Title 18, United States Code Section 3582(c)(1)(B) provides one such circumstance: "[A] court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." (Emphasis added). Section 404(b) of the First Step Act provides, in relevant part, that a court may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." This provision satisfies the express permission required under 18 U.S.C. § 3582(c)(1)(B) to modify an already imposed term of imprisonment by making retroactive the portions of the Fair Sentencing Act that lowered statutory penalties for certain offenses involving cocaine base. See, e.g., United States v. Wirsing, 2019 WL 6139017, at *7 (4th Cir. Nov. 20, 2019) ("We hold that § 3582(c)(1)(B) is the appropriate vehicle for a First Step Act motion."); United States v. Williams, No. 00 CR. 1008 (NRB), 2019 WL 5791747, at *5 (S.D.N.Y. Oct. 17, 2019) (construing a First Step Act motion

11

as brought pursuant to 18 U.S.C. § 3582(c)(1)(B)); United States
v. Davis, 2019 WL 1054554, at *2 (W.D.N.Y. Mar. 6, 2019) (same);
United States v. Potts, 2019 WL 1059837, at *2-3 (S. D. Fla.
Mar. 6, 2019) ("§ 3582(c) provides the procedural vehicle
whereby this Court may modify Defendant's sentence."); United
States v. Copple, 2019 WL 486440, at *2 (S.D. Ill. Feb. 7, 2019)
("The Court believes the better vehicle to impose a reduced term
of imprisonment [under Section 404 of the First Step Act] is §
3582(c)(1)(B).").

    The Fair Sentencing Act was enacted on August 3, 2010 and
did not apply retroactively. See Dorsey v. United States, 567
U.S. 260 (2012) (holding that the Act applied to any defendant
sentenced on or after August 3, 2010, regardless of when the
offense occurred). The First Step Act applies to "covered
offense[s]," which Section 404(a) defines as "a violation of a
Federal criminal statute, the statutory penalties for which were
modified by section 2 or 3 of the Fair Sentencing Act of 2010
(Public Law 111-220; 124 Stat. 2372), that was committed before
August 3, 2010," and provides that the court may "impose a
reduced sentence as if sections 2 and 3 of the Fair Sentencing
Act of 2010 . . . were in effect at the time the covered offense
was committed."

    Prior to the Fair Sentencing Act, under 21 U.S.C.
§ 841(b)(1)(A), an offense involving 50 grams or more of cocaine

base required a mandatory minimum term of imprisonment of 10 years and allowed a maximum term of life imprisonment. The mandatory sentence was doubled to 20 years if the defendant had a prior conviction for a felony drug offense, and to life imprisonment if the defendant had two such prior convictions. Section 2 of the Fair Sentencing Act changed the threshold quantity to 280 grams for application of these sentencing provisions.

In United States v. Johnson, 961 F.3d 181, 187 (2d Cir. 2020), the Second Circuit held that the Fair Sentencing Act "modified the statutory penalties for 21 U.S.C. § 841(b)(1)(A)(iii)" and that the defendant in that case was therefore eligible because he was sentenced for a violation of that statute. Id. That is, even though a conspiracy to distribute 50 grams or more of crack is "a statutory offense described by the interaction of Sections 846, 841(a)(1), and 841(b)(1)(A)(iii)," id. at 186, the "statutory penalties associated with" this particular statute are found in § 841(b)(1)(A)(iii), so that is the provision that was "modified," id. at 190 & n.6.

As expressly provided by Section 404(b) and Section 3582(c)(1)(B), this Court may modify the sentence of a defendant who was sentenced before August 3, 2010 only "to the extent" the defendant's sentencing exposure would be different under Section

2 or Section 3 of the Fair Sentencing Act. See United States v.
Barnett, No. 19-CV-0132 (LAP), 2020 WL 137162, at *5 (S.D.N.Y.
Jan. 13, 2020) (noting that the First Step Act "does not
authorize a plenary resentencing or a reevaluation of the facts
found at the time of conviction and sentencing"); United States
v. Hegwood, 934 F.3d 414, 418-19 (5th Cir 2019) (noting that the
First Step Act does not allow plenary resentencing); Williams,
2019 WL 5791747, at *5 (agreeing with the Government and the
"overwhelming majority of courts to address the issue" that the
First Step Act does not expressly permit a plenary
resentencing); United States v. Jones, No. CR 7:07-CR-84, 2019
WL 3767474, at *6 (W.D. Va. Aug. 9, 2019) ("The court thus
concludes, as have the clear majority of courts to have
addressed the issue, that a plenary resentencing is not
required."); Davis, 2019 WL1054554, at *2 (in rejecting an
argument that First Step Act permits plenary resentencing,
noting that "[n]owhere does the Act expressly permit the type of
plenary resentencing or sentencing anew that Davis advocates");
Potts, 2019 WL 1059837, at *3 (holding that First Step Act does
not authorize plenary resentencing); United States v. Brown, No.
07-20195-01, 2019 WL 4126555, at *3 (E.D. Mich. Aug. 30, 2019)
(same). Courts have reached this conclusion because permitting
plenary resentencing would both (i) provide an unfair "avenue
for sentencing adjustments wholly unrelated to Section 404's

express authorization to modify a sentence only in a particular way," and (ii) "carry a significant collateral windfall to all affected prisoners, reopening every aspect of their original sentences." United States v. White, 413 F. Supp. 3d 15, 41 (D.D.C. 2019) (internal quotation marks and citation omitted).

The structure of Section 404(b)—allowing only a reduction in sentence in limited circumstances to a limited class of prisoners—is analogous to that of 18 U.S.C. § 3582(c)(2), which provides in relevant part that, "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . , the court may reduce the term of imprisonment . . . ." (Emphasis added). And, the Supreme Court has found that Section 3582(c)(2) "does not authorize a sentencing or resentencing proceeding" and that it instead "provides for the modification of a term of imprisonment by giving courts the power to 'reduce' an otherwise final sentence in circumstances specified by the Commission." Dillon, 560 U.S. at 825. In arriving at that conclusion, the Court looked to the fact that 28 U.S.C. § 994(a)(2)(C) referred to Section 3582(c) as a "sentence modification provision" and that the "provision applies only to a limited class of prisoners—namely, those whose sentence was based on a sentencing range subsequently lowered by

the Commission." Id. at 825-26. Both reasons are equally applicable here to Section 404(b) and Section 3582(c)(1)(B).

The First Step Act also made prospective changes. Prior to the First Step Act, the statutory penalties in Sections 841(b)(1)(A) and 841(b)(1)(B) were increased in cases where the defendant had a prior conviction for a "felony drug offense." Section 401(a) of the First Step Act modified those provisions to require that an offense be a "serious drug felony or serious violent felony." Those amendments were made applicable to an offense committed before the First Step Act's enactment only "if a sentence for the offense has not been imposed as of such date of enactment." See First Step Act § 401(c).

### b. Compassionate Release

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

A Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Brooker, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020).

Although Courts are not constrained by the relevant Sentencing Commission policy statement, it remains instructive. That statement provides that the BOP may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3). While the Court is free to consider other circumstances as well, the Application Note describes some of the circumstances under which "extraordinary and compelling reasons" may exist, as relevant here:

> (A)   Medical Condition of the Defendant. —
>
>    (ii) The defendant is—
>
>       (I)      suffering from a serious physical or medical condition,
>       (II)     suffering from a serious functional or cognitive impairment, or
>       (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Even if the defendant articulates "extraordinary and compelling reasons" for release, the District Court must consider the factors set forth in Section 3553(a), which include, inter alia, "the nature and circumstances of the

offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities." United States v. Roney, __ F. App'x __, 2020 WL 6387844, at *1 (2d Cir. Nov. 2, 2020) (citing 18 U.S.C. § 3553(a)). As the proponent of release, the defendant bears the burden of proving that release is warranted under Section 3582. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992).

Relief under the First Step Act is discretionary. Section 404(b) provides that a court "may" reduce a sentence, as long as the defendant is eligible, subject to the limitations set forth in § 404(c). First Step Act § 404, 132 Stat. at 5222. "[A] district court retains discretion to decide what factors are relevant as it determines whether and to what extent to reduce a sentence." Moore, 975 F.3d at 92 n.36 (2d Cir.).

Still, discretion has limits. A decision on a motion for a reduced sentence remains subject to appellate review; where the decision evinces "an erroneous view of the law" or "a clearly erroneous assessment of the evidence," or where it falls outside "the range of permissible decisions," we will vacate. United States v. Borden, 564 F.3d 100, 104 (2d Cir. 2009) (quoting In re Sims, 534 F.3d 117, 132 (2d Cir. 2008)) (articulating the

abuse-of-discretion standard); see White, 984 F.3d at 88 ("[T]he deference afforded discretionary decisions, even those that are largely unconstrained by statutory language or judicial precedent, does not mean that such decisions are unfettered by meaningful standards or shielded from thorough appellate review." (quotation marks and citations omitted)). Moreover, although § 404 prescribes no procedure, "sound legal principles" must guide discretion. White, 984 F.3d at 88 (quotation marks and citations omitted). Accordingly, while district courts are not bound to apply the § 3553(a) factors in every First Step Act case, those factors may often prove useful. See Shaw, 957 F.3d at 741 ("Familiarity fosters manageability, and courts are well versed in using § 3553 as an analytical tool for making discretionary decisions."). The considerations listed in § 3553(a) may have different weight in the context of a defendant who is already imprisoned, but they remain sound guiding principles. Therefore, when reviewing a motion under the First Step Act § 404, "a district court may, but need not, consider the [§ 3553(a)] factors." Moore, 963 F.3d at 727 (8th Cir.); accord Concepcion, 991 F.3d at 290; Mannie, 971 F.3d at 1158 n.18. United States v. Moyhernandez, 5 F.4th 195, 205 (2d Cir. 2021) (cert. pending); accord United States v. Mannie, 971 F.3d 1145, 1158 n.18 (10th Cir. 2020) (emphasizing that nothing in Section 404 "precludes application of common sense,

regardless of whether a common-sense consideration also happens to be codified in § 3553").

### III. Discussion

The Court assumes, without deciding, that Defendant's health conditions constitute "extraordinary and compelling circumstances warranting release" under 18 U.S.C. Section 3582(c)(1)(A) and thus moves on to consider the Section 3553(a) factors.

In determining whether to exercise its discretion to reduce Defendant's sentence under the FSA, the Court will also consider the Section 3553(a) factors.

First, the Defendant's offenses of conviction were exceedingly serious and thus require exceedingly serious punishment.  He was the leader of a violent, long-running, and successful drug trafficking enterprise that distributed vast quantities of crack, powdered cocaine, and heroin for almost ten years in the Bronx.  In controlling his turf and driving out competitors, Defendant routinely instructed his underlings to engage in gun violence.  As set out above in more detail, Defendant provided guns to "enforcers" and ordered them to shoot at various locations on city streets where competitors were selling drugs.

Also as noted above, Defendant ordered his enforcers to shoot various rival drug dealers.  Most significantly, Defendant ordered the murder of Heriberto Diaz, another rival drug dealer; indeed, Defendant obtained a firearm from Steven Young and gave it to Tyrone Glynn, whom he had engaged to murder Diaz.  Glynn and Young both testified at trial that Glynn had the gun and used it to murder Diaz.

While Defendant's counsel do an admirable job of explaining that the FSA reflects Congress' change in attitude toward drug crimes, there is no change in attitude regarding guns or murder. Murder is murder—the taking of a human life—and this Defendant committed it to protect his commercial drug trafficking interests.  Defendant's crime was most serious and deserves a most serious punishment.  Judge Pauley imposed just that in meting out a sentence of thirty-eight years and four months (instead of the Guidelines Sentence of life).

Second, as Judge Pauley found at sentencing, Defendant remains a danger to public safety. Judge Pauley observed at sentencing that Defendant's friends and family "characterize[d] him as a wonderful dad or a good person" but noted the "shame" that "he didn't show those traits on the street."  Sent. Tr. at 30.  Judge Pauley departed downwardly from the Guidelines sentence of life to impose the "very lengthy incarceration" of thirty-eight years and four months to protect the public from

Defendant.  Id.  Judge Pauley found that "lengthy incarceration
[was] necessary so that Mr. Defendant does not present a clear
and present danger to the community if he is released. . . . I
cannot permit him to walk free in middle age."  Id. at 30-31.
And so Defendant should not walk free at age 52.

While Defendant's counsel has done an admirable job of
describing Defendant's employment while incarcerated and his
many courses and certificates, the fact remains that this 52-
year-old terrorized his fragile community with drugs and guns
for a decade, ordering shots to be fired on public streets, and
ordering the murder of a drug rival for his crass commercial
goals.  The Section 3553(a) factors counsel against a twenty-
some year reduction in sentence and in favor of not "permitting
[this Defendant] to walk free in middle age.

### IV.  Conclusion

Defendant's motions for re-sentencing under the First Step
Act and for compassionate release under 18 U.S.C. Section
3582(c)(1)(A) (dkt. no. 163) are denied.

The Clerk of the Court shall close the open motion.

Dated:     New York, New York
           February 23, 2022

                              _Loretta A. Presla_
                              LORETTA A. PRESKA
                              Senior United States District Judge

22